1
2
3
4
5
6
7
8
9
10
11
12

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

UNITED STATES OF AMERICA,           )
                                    )      Case No. 2:14-cr-00023-GMN-NJK
                Plaintiff,          )
                                    )
vs.                                 )      REPORT &  RECOMMENDATION
                                    )
JAMES SCOTT ALVA,                   )
                                    )      (Docket No. 20)
                Defendant.          )
_____ )

13    This matter was referred to the undersigned Magistrate Judge on Defendant James Scott
14  Alva's Motion to Suppress Statements.  Docket No. 20.  On July 21, 2015, the Court held an
15  evidentiary hearing on Defendant's motion.  Docket No. 96.  The Court has considered Defendant's
16  Motion, the United States' Response, Defendant's Reply, the evidence adduced at the evidentiary
17  hearing on this matter, and the parties' arguments.  Docket Nos. 20, 81, 87, 96.[1]

18  **I.      BACKGROUND**

19      **A.      Testimony of Detective Lora Cody**

20      On February 15, 2012, Las Vegas Metropolitan Police Department (LVMPD) Detective Lora
21  Cody arrived at the residence of Defendant James Scott Alva in Las Vegas, Nevada, in order to
22  execute a search warrant for evidence of child pornography crimes.  Hearing Tr. (7/21/2015) at 10:14
23  a.m.  LVMPD's SWAT team made entry, per LVMPD's policies, due to barricaded steel safety bars
24  on the windows and door of the residence.  Hearing Tr. (7/21/2015) at 10:15 a.m.  Detective Cody
25  testified that the entire team, including SWAT, briefed together prior to entry.  Hearing Tr.
26  (7/21/2015) at 10:35 a.m.    Detective Cody testified that SWAT made entry into the residence and

27  _____

28  [1]Citations to the recording of the hearing are noted by "Hearing Tr." followed by the relevant
    date and time of the hearing, as no written transcript has been prepared.

1   cleared the residence - she also testified that, in this case, she believed that SWAT made entry by

2   calling into the residence, and causing someone to come outside.  Hearing Tr. (7/21/2015) at 10:15-

3   10:16 a.m.  Inside the residence on this date were Defendant, his brother, his brother's caretaker and

4   the caretaker's young child.  Hearing Tr. (7/21/2015) at 10:16 a.m.  Approximately 20 minutes after

5   making entry, during which time SWAT cleared the residence and took photographs, SWAT handed

6   Defendant off to Detective Cody.  Hearing Tr. (7/21/2015) at 10:16-10:17 a.m.   At this time,

7   Defendant's hands were restrained behind his back with zip ties.  Hearing Tr. (7/21/2015) at 10:15-

8   10:16 a.m.  Defendant was the only person inside the house who was restrained by SWAT.  Hearing

9   Tr. (7/21/2015) at 10:16 a.m.; 10:38 a.m.

10        When she came into contact with Defendant, Detective Cody immediately cut his zip ties off

11   and gave him a copy of the search warrant, which Defendant read and indicated that he understood.

12   Hearing Tr. (7/21/2015) at 10:17 a.m.; 10:38 a.m.  Detective Cody testified that she cut off the zip

13   ties because Defendant was not under arrest that day, and she had no reason to restrain him.  Hearing

14   Tr. (7/21/2015) at 10:34 a.m.  Detective Cody was dressed in plainclothes, and carried her gun on

15   her hip under her clothing.  Hearing Tr. (7/21/2015) at 10:17-10:18 a.m.  She asked Defendant if he

16   would consent to an interview; when he indicated he would, Detective Cody took him to her 1999

17   minivan.  Hearing Tr. (7/21/2015) at 10:17 a.m.  Defendant sat in the front seat, unrestrained, during

18   the interview.  Hearing Tr. (7/21/2015) at 10:17 a.m.

19        Before beginning the interview, Detective Cody told Defendant that the search warrant was

20   for evidence of child pornography in the residence, and not for any individual person.  Hearing Tr.

21   (7/21/2015) at 10:18-10:19 a.m.  She also told Defendant that he was not under arrest, that he was

22   free to leave at any time, and that he did not have to speak with her.  Hearing Tr. (7/21/2015) at

23   10:18-10:20 a.m.  She told him he could leave the vehicle if he wanted, and he could return to his

24   residence if he wanted.  Hearing Tr. (7/21/2015) at 10:19 a.m.  She also told him that, if he returned

25   to his residence, he would not be able to move around the residence freely while the search was

26   underway.   She informed Defendant that he could sit on the couch during the search or that,

27   alternatively, he could wait outside or leave the area altogether.  Hearing Tr. (7/21/2015) at 10:19-

28   10:20 a.m. Detective Cody explained that the reason for this was so that no one would interfere with

law enforcement in their search and would also allow them to finish the search and leave the residence more quickly. Hearing Tr. (7/21/2015) at 10:20 a.m.

Detective Cody read Defendant his Miranda rights from her standard-issue LVMPD card. Defendant said he understood his rights. Hearing Tr. (7/21/2015) at 10:20 a.m. Although Detective Cody testified that Defendant was not in custody, was not under arrest, did not have to speak with her and was free to leave at any time, she read these rights to him "out of an abundance of caution," to make sure he understood all of his rights. Hearing Tr. (7/21/2015) at 10:21 a.m.

Detective Cody asked Defendant numerous questions, including who lived in the house, what kind of work he did, how many computers were in the house, who used them, and who had been to the residence. Hearing Tr. (7/21/2015) at 10:21 a.m. Eventually, Detective Cody asked Defendant if he had viewed child pornography. Hearing Tr. (7/21/2015) at 10:22 a.m. Initially, Defendant denied involvement with child pornography, and Detective Cody told him that someone in the residence, either Defendant or his brother[2], had downloaded child pornography. Hearing Tr. (7/21/2015) at 10:22 a.m. At this point in the investigation, Detective Cody did not yet know if it was Defendant or his brother who had downloaded child pornography, though she also testified that she was not present when the downloads occurred, so she was not certain at that time whether an unknown person could have downloaded the child pornography. Hearing Tr. (7/21/2015) at 10:22 a.m.; 10:36 a.m. Detective Cody did know at the time that only Defendant and his brother lived in the residence. Hearing Tr. (7/21/2015) at 10:36 a.m.

Shortly after asking Defendant about child pornography activities, Detective Cody began receiving text messages from members of her team who were conducting the search inside the residence. She and the other officers have a practice of texting back and forth regarding what is found during the search and what is learned during the interview, in order to complete the search in a more thorough, effective manner. Hearing Tr. (7/21/2015) at 10:22-10:23 a.m. During her interview of Defendant, Detective Cody received a text message from officers inside the house

---

[2]Detective Cody testified that she referenced Defendant's brother because, to her knowledge at that point, Defendant and his brother were the only two people she could physically place inside the residence at the time of the downloads, and not to intimidate Defendant. Hearing Tr. (7/21/2015) at 10:22 a.m.

1    informing her that they had found child pornography on a laptop located in Defendant's bedroom.

2    Hearing Tr. (7/21/2015) at 10:23 a.m.

3    At about this point, approximately 9 minutes and 30 seconds into the interview, Defendant

4    told Detective Cody that he wasn't sure, but thought he might need to speak to a lawyer, which

5    Detective Cody considered a request for an attorney.  Hearing Tr. (7/21/2015) at 10:23 a.m.; 10:36

6    a.m.  She responded by telling him that she appreciated that he wanted an attorney.  She gave him

7    her business card and told him that, if he decided he wanted to speak more, he could contact her or

8    have an attorney contact her.  Hearing Tr. (7/21/2015) at 10:24 a.m.  Defendant said a few times that

9    he was scared, that he wanted to talk, and that he did not want to speak with the recorder on.

10    Detective Cody told Defendant she would not turn the recorder off, and that it was there to protect

11    both of them.  Hearing Tr. (7/21/2015) at 10:24 a.m.

12    At some point, Detective Cody compared viewing child pornography to viewing a bad car

13    wreck, in order to downplay the severity of the crime and make Defendant feel a little more

14    comfortable.  Hearing Tr. (7/21/2015) at 10:24-10:25 a.m.  Detective Cody testified that talking

15    about curiosity regarding child pornography was a technique that she used during interviews, in this

16    case and others, to soften the crime in order to elicit a response.  Hearing Tr. (7/21/2015) at 10:36

17    a.m.  Defendant said, "I do want to talk, I'm just scared," and Detective Cody said, "[i]t's up to you,"

18    offered him her card a second time, and told him that he could contact her and come in at a later date

19    to speak with her if he wanted to do so.  Hearing Tr. (7/21/2015) at 10:25 a.m.; 10:29-10:30 a.m.

20    In response, Defendant said he wanted to talk to her right then, and that he was just scared of the

21    recorder.  Hearing Tr. (7/21/2015) at 10:25 a.m.; 10:30 a.m.  Detective Cody told Defendant again

22    that the recorder was there to protect both of them, and then asked Defendant how long he had been

23    looking at child pornography.  Hearing Tr. (7/21/2015) at 10:16 a.m.; 10:31 a.m.  Defendant then

24    gave an inculpatory statement.  Hearing Tr. (7/21/2015) at 10:31 a.m.; Government Exhibit 1.

25    During the statement, Defendant never stopped answering Detective Cody's questions.

26    Hearing Tr. (7/21/2015) at 10:32 a.m.  He never mentioned an attorney again.  Hearing Tr.

27    (7/21/2015) at 10:32 a.m.  He also told Detective Cody at some point that he had plans to leave town,

28    and she responded that he was not under arrest and could leave town if he chose to.  Hearing Tr.

1   (7/21/2015) at 10:32 a.m.  After she finished interviewing Defendant, Detective Cody made sure he

2   had her business card.  He then left her vehicle and returned to his residence.  Hearing Tr.

3   (7/21/2015) at 10:33 a.m.  The interview lasted approximately 27 minutes, and Defendant was in

4   Detective Cody's car for approximately one minute longer than the time noted on the recording.

5   Hearing Tr. (7/21/2015) at 10:39 a.m.  Detective Cody took Defendant into her vehicle to interview

6   him because of privacy concerns, as many neighbors were outside, and she did not want them to hear

7   the conversation.  Hearing Tr. (7/21/2015) at 10:34 a.m.

8       At the conclusion of the search warrant execution, Detective Cody came into contact with

9   Defendant's mother.  Hearing Tr. (7/21/2015) at 10:39 a.m.  Defendant was not restrained at this

10  time.  Hearing Tr. (7/21/2015) at 10:39 a.m.

11      **B.    Testimony of Mary Ann Taase**

12      Mary Ann Taase testified that she is the general manager of a home health agency.  Hearing

13  Tr. (7/21/2015) at 10:45 a.m.  On February 15, 2012, she was the personal caregiver for Defendant's

14  brother, Kim, and had been for approximately two to two-and-one-half years.  Hearing Tr.

15  (7/21/2015) at 10:45 a.m.; 10:55 a.m.  On February 15, 2012, Ms. Taase's shift was supposed to start

16  at 11:00 a.m., but she received a call from Kim asking if she could come early because he had an

17  accident and needed her help.  As a result, she arrived at the residence at approximately 7:00 a.m.

18  Hearing Tr. (7/21/2015) at 10:46 a.m.  Ms. Taase brought her child, who was approximately 5 years

19  old at the time, with her.  Hearing Tr. (7/21/2015) at 10:47 a.m.  While she was putting Kim on the

20  toilet about a half hour after she arrived at the residence, Ms. Taase heard noises over what she

21  described as an intercom.  Hearing Tr. (7/21/2015) at 10:47 a.m.  She then heard the noise a second

22  time, and her attention was drawn to it because of the number that was being called out, which was

23  the address of Kim's condo.  Hearing Tr. (7/21/2015) at 10:47 a.m.

24      At approximately 8:00 a.m. or a little later, Ms. Taase went to the door of the residence, and

25  a male in uniform told her to come outside with her hands up.  Hearing Tr. (7/21/2015) at 10:47-

26  10:48 a.m.  Ms. Taase testified that she was scared because her daughter was inside the residence.

27  Hearing Tr. (7/21/2015) at 10:48 a.m.  Ms. Taase testified that a SWAT team, comprised of "a lot"

28  of people, was outside the residence with guns drawn.  Hearing Tr. (7/21/2015) at 10:48 a.m.  When

1   SWAT told Ms. Taase to come outside with her hands up, she informed them that she had a child

2   inside, and asked if she could assist the disabled person inside the home, because he was completely

3   naked on the toilet and could fall at any time.  Hearing Tr. (7/21/2015) at 10:49 a.m.  In response,

4   a female officer told Ms. Taase that she had to release the child first, and then she would have to

5   come outside after the child.  Officers took her child behind a building, and the female officer told

6   her she had to wait to get her, even though her child was crying.  Hearing Tr. (7/21/2015) at 10:49

7   a.m.  Ms. Taase asked the officers if she could get Kim off the toilet because of the risk that he could

8   fall, and was told that she would have to wait.  Hearing Tr. (7/21/2015) at 10:49 a.m.

9        Officers then went inside the residence, while she waited outside for 45 minutes before she

10  could get Kim off the toilet.  Hearing Tr. (7/21/2015) at 10:49 a.m.  Once she was allowed to go

11  inside the residence, Ms. Taase put Kim in his wheelchair, and they went into the living room.

12  Hearing Tr. (7/21/2015) at 10:49 a.m.  During the this entire time, Kim asked officers what was

13  happening.  He also asked to see the search warrant.  Hearing Tr. (7/21/2015) at 10:49-10:50 a.m.

14  In response, officers told Ms. Taase and Kim that they had to wait, and that someone would speak

15  with them.  Hearing Tr. (7/21/2015) at 10:50 a.m.  While Kim was still in the bathroom, she could

16  hear Defendant asking for an attorney.  Hearing Tr. (7/21/2015) at 10:51-10:52 a.m.

17       During all of this time, Ms. Taase testified, Defendant was in his bedroom.  Hearing Tr.

18  (7/21/2015) at 10:50 a.m.  He did not come out of his bedroom until after Ms. Taase and Kim went

19  outside, as they were told to do by officers.  Hearing Tr. (7/21/2015) at 10:50 a.m.  When Ms. Taase

20  told officers she needed to call Kim's mom, officers allowed Ms. Taase and Kim to reenter the

21  residence.  Hearing Tr. (7/21/2015) at 10:50 a.m.  Ms. Taase first saw Defendant around 10:00 that

22  morning, or sometime later.  Hearing Tr. (7/21/2015) at 10:51 a.m.  His hands were bound behind

23  his back.  Hearing Tr. (7/21/2015) at 10:51 a.m.  Officers put Defendant by the fireplace and let Ms.

24  Taase call Kim and Defendant's mom to tell her what was happening.  Hearing Tr. (7/21/2015) at

25  10:51 a.m.  While Defendant was sitting by the fireplace, he was still asking officers what was going

26  on and whether he could have his attorney present.  Hearing Tr. (7/21/2015) at 10:52 a.m.

27       Officers searched Defendant's room during this period of time.  Also, a male and female

28  officer stated, "Somebody will talk to us."  Hearing Tr. (7/21/2015) at 10:52-10:53 a.m.  At some

1    point, Ms. Taase and Kim were made to leave the residence.  They waited outside for 45 minutes to

2    an hour, after which time she saw Defendant exit the residence, with his hands still bound.  Hearing

3    Tr. (7/21/2015) at 10:54 a.m.  Ms. Taase dressed Kim, which takes about 45 minutes to an hour, and

4    at approximately 11:00 or 11:30, she saw Defendant leave the residence with his mom.  Hearing Tr.

5    (7/21/2015) at 10:54 a.m.

6         **C.    Testimony of Kim Alva**

7         Kim Alva, Defendant's brother, testified that, on February 15, 2012, he heard a knock on the

8    door of his residence between 8:00 and 8:30 a.m., while he was in the bathroom.  Hearing Tr.

9    (7/21/2015) at 11:20-11:21 a.m.  Between 8:20 and 8:34 a.m., he could hear police speaking on

10   bullhorns from outside the residence.  Hearing Tr. (7/21/2015) at 11:22 a.m.  He heard the police

11   announce themselves and say, "James Alva, come out of the house," over the bullhorns.  Hearing

12   Tr. (7/21/2015) at 11:22 a.m.  Mr. Alva told Ms. Taase that she should open the door so that the

13   police would not knock down the door.  Hearing Tr. (7/21/2015) at 11:22 a.m.  Law enforcement

14   checked the whole residence before getting to him in the bathroom, where he sat on the toilet with

15   no clothes, which took approximately ten minutes.  Hearing Tr. (7/21/2015) at 11:23 a.m.  At almost

16   9:00 a.m., Ms. Taase got Mr. Alva out of the bathroom and dressed him, and then they went into the

17   living room.  Hearing Tr. (7/21/2015) at 11:23-11:24 a.m.  Police officers dressed in green fatigues

18   with guns, who "weren't very nice," came in and out of the living room.  Hearing Tr. (7/21/2015)

19   at 11:24 a.m.; 11:27 a.m.

20        At approximately 9:15 or 9:30 a.m., Mr. Alva saw his brother, Defendant, in the living room

21   tied to a chair.  His hands were behind his back and his legs were shackled to the chair, and remained

22   that way for 45 minutes to an hour.  Hearing Tr. (7/21/2015) at 11:24-11:25 a.m.  Defendant was the

23   only one in the residence who was restrained, and his hands were bound with zip ties.  Hearing Tr.

24   (7/21/2015) at 11:25 a.m.; 11:28 a.m.  Mr. Alva told the officers he wanted to see the search warrant.

25   Hearing Tr. (7/21/2015) at 11:29 a.m.  Defendant asked for a lawyer twice while he was seated with

26   his hands bound and the officers were walking in and out of the residence.  Hearing Tr. (7/21/2015)

27   at 11:29 a.m.  Defendant was not speaking to anyone in particular when he asked for an attorney,

28   though "he was pretty loud about it."  Hearing Tr. (7/21/2015) at 11:29 a.m.

1    Mr. Alva saw Defendant leave with one of the detectives and, as far as he knew, Defendant

2    was still in restraints.  Hearing Tr. (7/21/2015) at 11:25 a.m.  Mr. Alva admitted, however, that once

3    Defendant left the residence, Mr. Alva could no longer see him and did not know if Defendant was

4    still bound.  Hearing Tr. (7/21/2015) at 11:28 a.m.  Between 10:00 and 10:30 a.m., Mr. Alva saw

5    Defendant again, after he was released by officers.  Hearing Tr. (7/21/2015) at 11:26 a.m.  At that

6    time, Defendant left the residence with their mother.  Hearing Tr. (7/21/2015) at 11:28 a.m.  When

7    he left the residence, he was no longer bound.  Hearing Tr. (7/21/2015) at 11:28 a.m.

8    **D.      Testimony of Terry Alva Dinh**

9    Terry Alva Dinh, Defendant's mother, testified that, at approximately 9:00 a.m. on February

10   15, 2012, her son Kim's aid called her in despair and told her that there were police with weapons

11   drawn inside the residence.  Hearing Tr. (7/21/2015) at 11:32-11:33 a.m.  She sped to the house and

12   arrived at 9:05 a.m.  Hearing Tr. (7/21/2015) at 11:33 a.m.  When she arrived, Ms. Dinh saw

13   Defendant being escorted by what she assumed was a police officer through the next set of condos.

14   Hearing Tr. (7/21/2015) at 11:34 a.m.  Defendant was shaking and nervous, and his hands were

15   bound behind his back with zip ties.  Hearing Tr. (7/21/2015) at 11:34 a.m.  Defendant told her, "It's

16   ok.  I'll be back in a few minutes."  Hearing Tr. (7/21/2015) at 11:34 a.m.; 11:38 a.m.  Ms. Dinh next

17   saw Defendant approximately 30 to 45 minutes later, when Detective Cody brought him back from

18   her vehicle.  Hearing Tr. (7/21/2015) at 11:34-11:35 a.m.  When they approached Ms. Dinh,

19   Detective Cody removed the zip ties from Defendant's wrists.  Hearing Tr. (7/21/2015) at 11:35 a.m.

20   Detective Cody said Defendant was free to go, and Ms. Dinh and Defendant left the area.  Hearing

21   Tr. (7/21/2015) at 11:35 a.m.  Ms. Dinh does not know if the zip ties were on Defendant's wrists

22   during his interview with Detective Cody.  Hearing Tr. (7/21/2015) at 11:37-11:38 a.m.  Sometime

23   later, on a different date, Defendant was arrested.   Hearing Tr. (7/21/2015) at 11:39 a.m.

24   **E.      Testimony of Defendant James Scott Alva**

25   Defendant testified that, on February 15, 2012, law enforcement came into his residence with

26   automatic machine guns.   Hearing Tr. (7/21/2015) at 11:40 a.m.; 11:49 a.m.  This was his first

27   encounter with SWAT and he does not know how SWAT operates.  Hearing Tr. (7/21/2015) at 11:49

28   a.m.  Defendant woke up that morning and did not know what was going on.  He walked out the door

of his room, a SWAT officer summoned him over, and restrained his wrists with zip ties.   Hearing Tr. (7/21/2015) at 11:40-11:41 a.m.   "Quite a few" law enforcement officers were in the residence, and he was very afraid.   Hearing Tr. (7/21/2015) at 11:41 a.m.   Defendant was outside his residence when the zip ties were put on him, and then he was "pushed" back inside the residence and placed in a chair in the living room while the officers searched.   He was the only person who was restrained. Hearing Tr. (7/21/2015) at 11:42 a.m.; 11:49 a.m.   As officers walked in and out of the house, Defendant told the officers that he needed to talk to a lawyer and wanted to see a warrant.   He also said he wanted to know who they were since he saw nothing that identified them as police officers. Hearing Tr. (7/21/2015) at 11:43 a.m.; 11:50 a.m.   Defendant testified that there were a lot of people going in and out of the house, and there was a lot of commotion.   Hearing Tr. (7/21/2015) at 11:50 a.m.   At that point, Defendant testified, he did not feel free to leave.   Hearing Tr. (7/21/2015) at 11:43 a.m.

Defendant felt as if he sat in the chair in the living room "for quite a while" before speaking with Detective Cody.   Hearing Tr. (7/21/2015) at 11:43 a.m.   Detective Cody came up to him and told him to follow her, so he did.   Hearing Tr. (7/21/2015) at 11:44 a.m.   Defendant followed Detective Cody around the condos into her unmarked vehicle.   Hearing Tr. (7/21/2015) at 11:44 a.m.; 11:50 a.m.   Defendant was placed inside the vehicle, and remained restrained during the interview. Hearing Tr. (7/21/2015) at 11:44 a.m.   While Defendant was in the vehicle with his hands restrained, he did not feel free to leave, and was afraid of what might happen to him if he did leave. Hearing Tr. (7/21/2015) at 11:45 a.m.   During cross-examination, however, Defendant stated that he "believes" he was restrained while in the vehicle.   Hearing Tr. (7/21/2015) at 11:58 a.m.

During the interview with Detective Cody, Defendant "did a lot of talking" and, when he gets nervous, he talks "very much."   Hearing Tr. (7/21/2015) at 11:45 a.m.   At about 9 minutes and 30 seconds into the interview, Defendant requested an attorney.   Hearing Tr. (7/21/2015) at 11:46 a.m. Nonetheless, Detective Cody continued speaking to Defendant, and he continued responding to her questions, because he was afraid that everyone would go to jail if he did not speak.   Hearing Tr. (7/21/2015) at 11:46 a.m.   One of the officers inside the residence told Defendant he needed to speak, or everyone in the residence would go to jail, so he felt he needed to talk.   Hearing Tr.

1  (7/21/2015) at 11:46 a.m.  On cross-examination, Defendant stated that Detective Cody was the one

2  who told him inside the house that everyone in the residence would go to jail if he did not speak.

3  Hearing Tr. (7/21/2015) at 11:51 a.m.   Additionally, during Defendant's recorded interview,

4  Detective Cody told him that he could leave at any time and that no one was under arrest that day,

5  and Defendant responded, "Okay."   Hearing Tr. (7/21/2015) at 11:52-11:53 a.m.; Exhibit 1.

6  Defendant did not state on the recording that he had just been told that everyone would go to jail if

7  he did not talk.  Hearing Tr. (7/21/2015) at 11:53 a.m.

8          After telling Detective Cody he wanted a lawyer, Defendant continued talking to her.

9  Hearing Tr. (7/21/2015) at 11:56 a.m.  During the interview, Detective Cody explained to Defendant

10  that the officers had to restrain him when they first make entry, because they did not know who was

11  in the house, or if anyone had weapons.  Hearing Tr. (7/21/2015) at 12:02 p.m.  Defendant responded

12  "yeah, I know," but made no statement regarding still being restrained.  Hearing Tr. (7/21/2015) at

13  12:02 p.m.  Defendant does not remember asking Detective Cody to remove the restraints while he

14  was in her vehicle.  Hearing Tr. (7/21/2015) at 12:03 p.m.

15          When Defendant returned to the residence after the interview, Detective Cody told him he

16  could leave, so he left the area.  Hearing Tr. (7/21/2015) at 11:45 a.m.  She gave him her business

17  card while walking back to the residence.  Hearing Tr. (7/21/2015) at 11:57 a.m.  Defendant does

18  not remember whether his hands were still restrained when Detective Cody gave her his business

19  card.  Hearing Tr. (7/21/2015) at 11:58 a.m.  Defendant left the area with his mother after his

20  interview with Detective Cody.  Hearing Tr. (7/21/2015) at 12:00 p.m.  No one was taken to a police

21  station or arrested that day.  Hearing Tr. (7/21/2015) at 12:01 p.m.  The police left the house that day,

22  and Defendant was arrested on the instant case on an entirely different day.  Hearing Tr. (7/21/2015)

23  at 12:00-12:01 p.m.

24          Defendant was involved in a car accident sometime around 1991.  As a result, he suffers

25  short-term memory loss when he is nervous.  Hearing Tr. (7/21/2015) at 11:59 a.m. -12:00 p.m.

26  **F.      Testimony of Detective Vicente Ramirez**

27          LVMPD Detective Vicente Ramirez testified that he was involved in the execution of the

28  search warrant on Defendant's residence on February 15, 2012.  Hearing Tr. (7/21/2015) at 12:19

p.m.  Detective Ramirez's role was primarily to provide security and to search.  Hearing Tr. (7/21/2015) at 12:19 p.m.  He was involved in setting up an outside perimeter to control people coming into the area while SWAT made entry, then providing security until he could start searching or conduct forensics.  Hearing Tr. (7/21/2015) at 12:19 p.m.  It took SWAT about 30 to 40 minutes to make entry.  Hearing Tr. (7/21/2015) at 12:20 p.m.  Detective Ramirez estimated that he entered the residence that day at approximately 9:40-10:00 a.m., and left at approximately 11:30 a.m. Hearing Tr. (7/21/2015) at 12:24 p.m.

When the team executes a search warrant on a residence, the majority of the occupants of the residence are originally restrained by SWAT.  Hearing Tr. (7/21/2015) at 12:20 p.m.  In this case, Detective Ramirez saw that Defendant was restrained, but that his brother was not restrained for health reasons.  Hearing Tr. (7/21/2015) at 12:20 p.m.  Detective Cody interviewed Defendant. Hearing Tr. (7/21/2015) at 12:21 p.m.  The procedure of their team when executing a search warrant is to request an interview with anyone on scene with whom they want to speak.  If the person agrees, the member of the team will take the person into his or her vehicle for the interview, in order to have a more private setting.  Hearing Tr. (7/21/2015) at 12:21 p.m.  If an individual has been restrained during entry, that person is "absolutely" unrestrained prior to the interview.  Hearing Tr. (7/21/2015) at 12:21 p.m. Detective Ramirez knew that Defendant was unrestrained during the interview because it is the practice of his team to cut off the plastic ties of occupants of residences during search warrants in which SWAT made entry as soon as the occupants are brought to the team members by SWAT.  Hearing Tr. (7/21/2015) at 12:21-12:22 p.m.  In Detective Ramirez's experience, the only way a person would be restrained during an interview such as this one would be if that person was going to be arrested and not released, or if the person was a threat.  Hearing Tr. (7/21/2015) at 12:27 p.m.  Neither of these circumstances applied to Defendant on February 15, 2012.  Hearing Tr. (7/21/2015) at 12:27 p.m.

Detective Ramirez observed Detective Cody bringing Defendant back to the residence after interviewing him, and Defendant was not in restraints at that time.  Hearing Tr. (7/21/2015) at 12:22 p.m.  Detective Ramirez was present at the residence for approximately an hour after Defendant returned from his interview with Detective Cody.  Hearing Tr. (7/21/2015) at 12:22 p.m.  During that

1   time, Defendant was mostly in the front room area, though he walked to the front door a few times.

2   When he did, he was asked to remain in the front room area, because officers were still executing

3   the search warrant, and did not know yet where all the evidence would be found.   Hearing Tr.

4   (7/21/2015) at 12:22-12:23 p.m.   Defendant was not in restraints at this time.   Hearing Tr.

5   (7/21/2015) at 12:23 p.m.   Detective Ramirez observed Defendant enter the residence and walk in

6   and out twice.   Hearing Tr. (7/21/2015) at 12:25 p.m.   At some point, Defendant left the residence.

7   Hearing Tr. (7/21/2015) at 12:25 p.m.   Defendant was not arrested on February 15, 2012.   Hearing

8   Tr. (7/21/2015) at 12:27 p.m.

9   **II.**   **ANALYSIS**

10           **A.**     **Credibility of Witnesses**

11           The Court ordered an evidentiary hearing because the facts presented in the parties' briefing

12   contradicted each other.   "The longstanding and repeated invocations in caselaw of the need of

13   district courts to hear live testimony so as to further the accuracy and integrity of the factfinding

14   process are not mere platitudes.   Rather, live testimony is the bedrock of the search for truth in our

15   judicial system."   United States v. Thoms, 684 F.3d 893, 903 (9th Cir. 2012).   "[J]udges simply

16   cannot decide whether a witness is telling the truth on the basis of a paper record and must observe

17   the witnesses' demeanor to best ascertain their veracity - or lack thereof."   Oshodi v. Holder, 729

18   F.3d 883, 892 (9th Cir. 2013) (internal citation omitted).   See also See United States v. Howell, 231

19   F.3d 615, 621 (9th Cir. 2000) (evidentiary hearing required where defendant demonstrates that a

20   significant disputed factual issue exists); United States v. Mejia, 69 F.3d 309, 315 (9th Cir. 1995)

21   ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the

22   witness's credibility").

23           During the evidentiary hearing in this matter, the Court had the opportunity to listen to the

24   testimony of all witnesses, to observe and evaluate each witness' demeanor while testifying, and to

25   weigh each witness' credibility.   Having done so, the Court finds Detectives Cody and Ramirez's

26   testimony credible.   The testimony of Defendant and his witnesses, however, varied widely

27   regarding, among other things, the time officers arrived; the amount of time officers spent at the

28   residence; and where and for how long Defendant was restrained.   The Court recognizes that, as the

1   parties argued, Defendant and his witnesses had not undergone a situation such as this before and

2   even testified that they were overwhelmed that day, thus adding to their confusion; while Detectives

3   Cody and Ramirez have been in this type of situation thousands of times and are trained to observe

4   and remember the surrounding circumstances, including when restraints are removed, all of which

5   also contribute to a finding of credibility for the Detectives over Defendant and his witnesses.

6   Additionally, Defendant, in his own testimony, contradicted himself several times, and seemed

7   confused at times throughout the testimony, as shown in one example by his inability to recall

8   whether he was restrained when Detective Cody handed him her business card.

9       **B.    Suppression of Statement**

10      Defendant asks this Court to suppress his statement because the interview constituted

11  custodial interrogation, as Defendant was not free to leave.  Also, Defendant requested an attorney

12  before making his statement.  The United States argues that Defendant was not in custody at the time

13  of his interview, and was not restrained.  The United States further argues that, although Defendant

14  and his family were overwhelmed by the execution of the search warrant and the officers at the

15  scene, those facts do not convert his interview into a custodial interrogation.

16      Interrogation initiated by law enforcement officers after a suspect "has been taken into

17  custody or otherwise deprived of his freedom of action in any significant way" must be preceded by

18  Miranda warnings.  Miranda v. Arizona, 384 U.S. 436, 444 (1966); accord United States v. Wilson,

19  666 F.2d 1241, 1246 (9th Cir. 1982).  "In order to combat [the pressures inherent in custodial

20  interrogation] and to permit a full opportunity to exercise the privilege against self-incrimination,

21  the accused must be adequately and effectively apprised of his rights."  United States v. Williams,

22  435 F.3d 1148, 1151 (9th Cir. 2006) (quoting Miranda, 384 U.S. at 467).

23      The "touchstone" for Miranda warnings is whether the suspect is in custody when

24  interrogated.  United States v. Barnes, 713 F.3d 1200, 1205 (9th Cir. 2013) (citing Rhode Island v.

25  Innis, 446 U.S. 291, 300 (1980)).  To determine whether an individual was in custody, the Court

26  must examine the totality of the circumstances.  See Thompson v. Keohane, 516 U.S. 99, 112 (1995).

27  The test is whether "a reasonable innocent person in such circumstances would conclude after brief

28  questioning [that] he or she would not be free to leave."  United States v. Bassignani, 575 F.3d 879,

883-84 (9th Cir. 2009) (quoting United States v. Booth, 669 F.2d 1231, 1235 (9th Cir.1981)).  A Miranda warning functions both to reduce the risk that an involuntary or coerced statement will be admitted at trial and to implement the Fifth Amendment's self-incrimination clause.  Id. at 1151.  Thus, if a suspect in custody does not receive an adequate warning effectively apprising him of his rights before he incriminates himself, his statements may not be admitted as evidence against him.  Id. at 1152.  In determining whether a suspect was in custody, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with formal arrest."  Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).

The determination of whether a defendant is in custody for purposes of the requirement to provide Miranda warnings is determined by examining the objective circumstances of the interrogation. Stansbury, 511 U.S. at 323.  Because the Court is directed to examine the objective circumstances of the interrogation, the subjective views of either the suspect or the interrogating officer is not relevant to the determination of whether the defendant was in custody.  Id. See also United States v. Leasure, 122 F.3d 837, 840 (9th Cir. 1997).  The Ninth Circuit has identified five factors relevant to the custody determination: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual."  United States v. Kim, 292 F.3d 969, 974 (9th Cir. 2002).

In looking at the first Kim factor, the language used to summon Defendant, the Court finds that, after cutting off his zip ties, Detective Cody asked Defendant if he would consent to speak with her.[3]  When he agreed, she asked him if he would follow her to her vehicle, which he did.  The Ninth Circuit has found that, where a defendant agrees to accompany officers, this factors weighs in favor of non-custody.  Bassignani, 575 F.3d at 884.  Therefore, as Defendant agreed to accompany Detective Cody, the Court finds that this factor weighs in favor of non-custody.

---

[3]Ms. Taase and Defendant's brother corroborate Detective Cody's testimony regarding the zip ties.  Both testified that Defendant was still zip tied when he left the residence with an officer.  Detective Cody testified that Defendant was brought to her outside the residence by a SWAT officer while still restrained, and that she immediately removed the zip ties.

1    In evaluating the second Kim factor, the extent to which Defendant was confronted with

2    evidence of guilt, the Ninth Circuit has found a defendant in custody "when the interrogator adopts

3    an aggressive, coercive, and deceptive tone." Bassignani, 575 F.3d at 884.  By way of contrast, the

4    Circuit has found this factor to weigh in favor of non-custody when the officers "did not attempt to

5    challenge [the defendant's] statements with other 'known facts' suggesting his guilt, they merely

6    asked [him] about the allegations." Id. (quoting United States v. Norris, 428 F.3d 907, 913 (9th Cir.

7    2005).  In the instant case, Detective Cody used an open, friendly tone throughout the entire 27-

8    minute interview with Defendant. See Exhibit 1.  Defendant participated actively in the interview,

9    even choosing to continue speaking while Detective Cody offered her business card and told him he

10   or an attorney could contact her at a later date.  As in Bassignani, the "conversation was clearly

11   consensual."  575 F.3d at 884.   This factor, then, weighs in favor of non-custody.

12   The third Kim factor is the physical surroundings of the interrogation.  Here, Defendant was

13   interviewed, unrestrained, in the front seat of Detective Cody's vehicle, which was not outfitted with

14   any sort of cage.  Detective Cody was dressed in plainclothes with her weapon hidden.  She was the

15   only person in the vehicle other than Defendant, who sat right next to a door.  Detective Cody

16   testified that Defendant was interviewed in her vehicle because neighbors were outside and she did

17   not want them to hear the discussion for Defendant's privacy.  The Court finds no indication that

18   Defendant was interviewed in the vehicle in order to isolate him from the outside world or to prevent

19   him from contacting others.  Nonetheless, since Defendant was taken away from the residence for

20   the interview, the Court in an abundance of caution finds this factor neutral.

21   The fourth Kim factor is the duration of the detention.  The Ninth Circuit has held that a

22   defendant is not in custody when he was interrogated for more than an hour.  United States v.

23   Crawford, 372 F.3d 1048, 1052 (9th Cir. 2004) (en banc). The Circuit has also held that a defendant

24   who was interrogated for "approximately 45 minutes" was not in custody.  Norris, 428 F.3d at 911.

25   Here, the interview lasted 27 minutes, and Detective Cody testified that Defendant was in her vehicle

26   for approximately one minute longer than the interview itself.  The Court therefore finds that this

27   factor weighs in favor of non-custody.

28

The fifth and final Kim factor is the degree of pressure used to detain Defendant. The Ninth Circuit has "consistently held that a defendant is not in custody when officers tell him that he is not under arrest and is free to leave at any time." Bassignani, 575 F.3d at 886. See also Crawford, 372 F.3d at 1060 ("Perhaps most significant for resolving the question of custody, Defendant was expressly told that he was not under arrest..."). Here, Defendant was told numerous times that he was not under arrest and that he was free to leave at any time, and he was free to terminate the interview at any time. Further, Defendant told Detective Cody he had plans to leave town, and she told him that he was not under arrest and was free to go anywhere he wanted. Defendant also told his mother, as he walked toward Detective Cody's vehicle, that everything was okay and he would be right back. Finally, after the statement, Detective Cody walked Defendant back to his residence and left him alone - free to leave. Defendant, in fact, did leave the area with his mother after he spoke to Detective Cody, and was not arrested that day. This factor, then, clearly weighs in favor of non-custody.

The Court therefore finds, based on the totality of the circumstances, and the Kim factors, that a reasonable innocent person in the circumstances of this case would conclude after brief questioning that he would be free to leave. Accordingly, the Court finds that Defendant was not in custody and the interview thus did not constitute custodial interrogation.[4]

As Defendant was not in custody during his interview, it follows that he could not invoke his right to counsel. Law enforcement officers "must terminate interrogation of an accused in custody if the accused requests the assistance of counsel." Minnick v. Mississippi, 498 U.S. 146, 147 (1990). Since Defendant was not in custody, his Fifth Amendment right to counsel had therefore not vested at the time of the interview.[5] See Michigan v. Jackson, 475 U.S. 625, 683 (1986) ("The Fifth

---

[4]The United States submits that Defendant knowingly, intelligently and voluntarily waived his Miranda rights and did not invoke his right to counsel. Docket No. 81 at 6-10. Since the Court has found that Defendant was not in custody at the time of the interview, Miranda rights were not necessary and the Court does not reach this issue.

[5]Even so, after Defendant stated that he wanted to speak to an attorney, Detective Cody attempted to end the interview by giving him her business card and telling him he or his attorney could contact her on another day if he decided he wanted to talk. Defendant instead made clear that he wanted to continue talking to Detective Cody that day. See Connecticut v. Barrett, 479 U.S. 523, 527 (1987).

Amendment protection against compelled self-incrimination provides the right to counsel at custodial interrogations"); United States v. Ellison, 632 F.3d 727, 731 (1st Cir. 2010) ("even if Ellison had clearly expressed a desire to speak with a lawyer, he could not have invoked any constitutional right to do that in a non-custodial interrogation conducted before he was formally charged").   See also United States v. Wyatt, 179 F.3d 532, 537 (7th Cir. 1999) ("The Fifth Amendment right to counsel safeguarded by Miranda cannot be invoked when a suspect is not in custody...."); United States v. Boskic, 545 F.3d 69, 84 (1st Cir. 2008) ("The Sixth Amendment takes hold when the investigation gives way to a prosecution....").

## RECOMMENDATION

Based on the foregoing and good cause appearing therefore,

IT IS RECOMMENDED that Defendant James Scott Alva's Motion to Suppress Statements, Docket No. 20, be **DENIED**.

## NOTICE

Pursuant to Local Rule IB 3-2 **any objection to this Report and Recommendation must be in writing and filed with the Clerk of the Court within 14 days of service of this document.** The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  Thomas v. Arn, 474 U.S. 140, 142 (1985).  This Circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  Martinez v. Ylst, 951 F.2d 1153, 1157 (9th Cir. 1991); Britt v. Simi Valley United Sch. Dist., 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 7th day of August, 2015.

NANCY J. KOPPE
United States Magistrate Judge